36518. HEATH *v.* GEORGIA MILITARY ACADEMY.

DECIDED FEBRUARY 28, 1957.

*Roy B. Rhodenhiser, Jr., Buckner F. Melton,* for plaintiff in error.

*Sell & Comer, John D. Comer,* contra.

GARDNER, P. J. 1. The evidence introduced in the case is lengthy, covering 107 pages. It is our opinion that it is not essential to set out the evidence in detail. In *Matthews* v. *Riverside Academy,* 45 *Ga. App.* 30 (163 S. E. 238) the court said: "Where a boarding-school which has limited facilities for the accommodation of students contracts with a parent to admit his son as a pupil in the school for the academic year, and where the engagement of teachers and other provisions for the management of the school are contracted for by the school for the entire year in advance, all of which is in the contemplation of the parties at the time of the execution of the contract, and where the catalogue of the school, which, by the express terms of the contract, is made a part of the contract, provides that it is a condition upon which a pupil is admitted to the school that he remain until the end of the academic year, and that as 'the engagement of teachers and other provisions for the management of the school are contracted for the entire year in advance, it is distinctly understood between the parent and the school that there can be

no reduction in the charges of any' pupil who leaves the school before the expiration of the academic year except in case of sickness, the contract, notwithstanding the payments required of the parent are payable for separate periods of the academic year, is not severable, but is an entire contract, and where the pupil, who entered the school pursuant to the contract, voluntarily left before the expiration of the academic year, the school, after the expiration of the year, is entitled to recover on the contract the amount contracted for in payment for board and tuition for the entire year, where it does not appear that the place vacated by the pupil in the school was filled.by the admission of another pupil. Civil Code (1910), § 4228; *Sutton* v. *Howard,* 33 *Ga.* 536; *Newman* v. *Wolfson,* 69 *Ga.* 764; *Sanders* v. *Carter,* 91 *Ga.* 450 (17 S. E. 345); *Allison* v. *Dunwody,* 100 *Ga.* 51 (28 S. E. 651); *Henderson Elevator Co.* v. *North Georgia Milling Co.,* 126 *Ga.* 279 (55 S. E. 50); *Mayor &c. of Washington* v. *Potomac Engineering Co.,* 132 *Ga.* 849 (65 S. E. 80); *Martin* v. *Lott,* 144 *Ga.* 660 (87 S. E. 902)." See also *Georgia Military Academy* v. *Rogers,* 35 *Ga. App.* 789 (134 S. E. 829). We might add that there is no evidence to show that the vacancy created by the son of the defendant was filled during the year. In fact, the evidence shows that it was not.

The defendant testified that he intended, definitely and unequivocally, to enroll his son for the scholastic year 1954-55. The defendant testified in part as follows: "Q. Now, during the next academic year, you elected the same type payment plan that you had elected in 1953, didn't you? You agreed to pay a certain amount in cash and you actually paid that; is that right? A. Yes. Q. How much did you pay to Georgia Military Academy? A. I don't recall the exact figures. You mean for tuition or for books or for insurance? Q. No, sir. How much did you pay down payment? A. I think it must have been around $350. Q. And you paid that in order to enter into another contract for the academic year of '54-'55, didn't you? A. That's right. Q. Exactly the same type contract you had entered into for the other years; is that right? A. That's right. Q. Under the same conditions, obligations and limitations; isn't that correct? A. That's right."

The court propounded the following questions while the defendant was on the stand: "Q. Didn't you understand that he was going back and being enrolled in school the same way he was the year before? I didn't quite understand— A. My payment plan was, yes, sir. I agreed on the payment plan. Q. Did you understand you were subject to the same discipline rules? A. Sure. Q. And the same terms of the contract? I think we stopped when he said no there. There may be some further interrogation; I don't know. But you understood, did you, that the agreement was he was under the same plan and the same terms and requirements he was before? A. Yes, sir."

The defendant testified further: "Q. Now, Mr. Heath, for the academic year of '54-'55 I believe you have already testified that you paid part of the contract price under the terms of the old contract; is that right? A. Right. Q. And you intended thereby to enter into a new contract if they would take your boy back? Is that right? A. Well, I was going to pay what I promised to pay if I got something for it. Q. Under the same terms as the old contract? A. That's right."

There was nothing in the record to vary the terms of the written contract which was adopted by intention and action of the parties. The record shows that Cadet Heath did not do well in school during the 1953-54 term and in 1954 summer school, and that Heath went to G. M. A. and had a conversation about his son with Colonel Brewster, G. M. A.'s president. Colonel Brewster assured Mr. Heath that Cadet Heath had a chance to graduate provided he did satisfactory work and provided his conduct was satisfactory. By Heath's admission, Colonel Brewster in no way agreed to modify or vary the terms and conditions stated in the catalog. The defendant testified further: "Q. Mr. Heath, that brings on one or two other questions. You did not understand your agreement with Colonel Brewster in any way to modify anything said in his catalog, did you? A. No."

In our opinion, the testimony of the defendant as a party was self-contradictory and equivocal. In *City of Thomasville* v. *Crowell*, 22 *Ga. App.* 383 (1b) (96 S. E. 335), this court said: "The testimony of a party who offers himself as a witness in his own behalf must be construed most strongly against him, if it be self-contradictory, vague or equivocal."

The defendant in the course of the trial suggested that he did not read the contents of the application or of the catalog and draws the conclusion that he should not be bound by the terms therein. This suggestion is not founded in law, since there is no allegation or proof or suggestion of misrepresentation, fraud or fiduciary relationship. See *Ward* v. *Colt Co.*, 28 *Ga. App.* 24 (1) (109 S. E. 921) wherein this court said: "It is well settled that one who signs a written contract without reading it can not avoid liability thereon because he was ignorant of its contents, when his signing was not induced by any false representation amounting to fraud on the part of the person with whom he was dealing. *Barnes* v. *Slaton Drug Co.*, 21 *Ga. App.* 580 (94 S. E. 896) ; *Tinsley* v. *Gullatt Gin Co.*, 21 *Ga. App.* 512 (2) (94 S. E. 892)." In *Morrison* v. *Roberts,* 195 *Ga.* 45 (23 S. E. 2d 164) the Supreme Court said: "Where one who can read signs a contract without apprising himself of its contents, otherwise than by accepting representations made by the opposite party, with whom there exists no fiduciary or confidential relation, he can not defend an action based on it, or have it canceled or reformed, on the ground that it does not contain the contract actually made, unless it should appear that at the time he signed it some such emergency existed as would excuse his failure to read it, or that his failure to read it was brought about by some misleading artifice or device perpetrated by the opposite party, amounting to actual fraud such as would reasonably prevent him from reading it."

The court did not err in directing a verdict for the plaintiff, in view of the record in this case. The above covers the general grounds and one assignment of error in the special grounds.

2. The remaining assignment of error is based on the contention that the judgment of the court sustaining paragraph 2 of the plaintiff's demurrer to the defendant's answer as amended was erroneous in that the defendant and Colonel Brewster rescinded the contract and it is suggested also in the amended motion that there was accord and satisfaction. The plaintiff contends that Colonel Brewster had a conversation with the defendant after the son of the defendant was dismissed. We will quote some of the evidence concerning this contention of the defendant. The defendant testified: "Q. What, if anything did Colonel Brewster

tell you at that time? A. He just told me that the school had found fit to expel him and he couldn't attend school there, and I asked him then in return for my money, and he said that I was entitled—that he thought I was entitled to two-thirds or at least half of it back, but it would have to go before the board, and he didn't just up and issue checks; that my money would be mailed to me. Q. Now, what money was he referring to and what money were you referring to? A. I was referring to the $349 I paid him, and I also asked him about my school book money and he asked me to go by the school book store, which I think he said his wife ran, and she would give me my money back. Well, we went by the school book store to get the money back and she said she would mail a check, but we never did receive it. Q. Have you ever received any money whatsoever back from Georgia Military Academy? A. No, sir. Q. Now, Mr. Heath, you have also testified as to another conversation with Mr. Brewster some weeks later, after your boy had been dismissed. Is that right? A. Right. Q. Do you recall that conversation? A. Yes. Q. And you have stated that Colonel Brewster said that he would have to refer this matter to an executive committee. A. Yes, sir. Q. And that's all he promised to do, isn't it, Mr. Heath? A. He said that I—that he thought that I was entitled to at least two-thirds or half of my money back, but it would have to go before the board. Q. That's the extent of what he said? A. That's right. Q. He in no way ever definitely agreed with you to give your money back, did he, Mr. Heath? A. He didn't say he could. Q. Did he say that anybody would? A. He said I was entitled to it. Q. Isn't all he said—Didn't you testify just a minute ago that all he said was that in his opinion you might be entitled to a refund and he would refer it to somebody else? A. That's right."

Cadet Heath, the son of the defendant, testified in part as follows: "Q. Did he ask Colonel Brewster for his money back? A. Yes, sir, he asked him for it. Q. And what did Colonel Brewster respond, if anything? A. He said he couldn't just issue a check, but he thought my father was entitled to half, if not two-thirds of the money he had already paid him." On the same point Colonel Brewster testified in part as follows: "Q. Col.

Brewster, you have heard Mr. Heath testify as to an alleged conversation with you concerning the possibility of a refund of the balance of the tuition. Do you recall that conversation? A. I'm not positive about it. It could have taken place. I have so many conversations with people and their sons. It could have taken place. Q. You mean by that, what could have taken place? A. That conversation when he came to pick up his boy to take him home. I think possibly it did, but I have no vivid recollection of that particular conversation. Q. Will you state whether or not, if the conversation took place, that you told Mr. Heath that he would get back part of his tuition? A. I might have told him that I would refer it to the administrative staff, but I would say this: That I have never told anyone, when a boy was dismissed from school or withdrawn from school, unless because of an act of God, that they would get any refund. I have sometimes said that I would refer it to the administrative staff. There are four of us there in executive positions that constitute the staff, and sometimes I do call them in. I don't have to abide by their decision on a particular case, but I sometimes call them in; so there is a possibility that I did tell Mr. Heath that I would refer it to the administrative staff, but under no circumstances did I ever tell anyone that I thought I would personally make a refund, because I have never seen that that was the thing to do. Q. Are you positive of that, Colonel? A. Yes, sir, I am positive."

We thus conclude that there was no promise from Colonel Brewster that a refund would be made and the only promise was to refer the matter to the proper authorities for decision. Cadet Heath was called before the disciplinary committee which committee had authority to make investigation and to decide whether or not the cadet had been guilty of such infraction of rules that he should be dismissed. After a hearing before the disciplinary committee, that committee dismissed Cadet Heath on the basis of admissions which he had made to the committee and from evidence from other sources. The infractions of the rules are set out fully in the record and were ample, under the rules introduced into the record, to authorize dismissal of Cadet Heath. We see no necessity of going into details as to what rules and

regulations, or how many times, Cadet Heath violated them during the time he was in Georgia Military Academy.

The court did not commit reversible error in any respect as contended by the defendant.

*Judgment affirmed. Carlisle, J., concurs. Townsend, J., concurs in the judgment.*